## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KKR & CO. GP LLC, | Civil Action No. _____ |
| Plaintiff, | |
| v. | |
| DOHA MEKKI, in her official capacity as ACTING ASSISTANT ATTORNEY GENERAL OF THE UNITED STATES FOR THE ANTITRUST DIVISION, UNITED STATES DEPARTMENT OF JUSTICE, the FEDERAL TRADE COMMISSION, and UNITED STATES OF AMERICA, | |
| Defendants. | |

## <u>COMPLAINT</u>

Plaintiff KKR & Co. GP LLC ("KKR GP" and, together with its corporate affiliates, "KKR"), files this Complaint against Defendants Doha Mekki, in her official capacity as Acting Assistant Attorney General of the United States for the Antitrust Division, the United States Department of Justice (the "Antitrust Division"), the Federal Trade Commission ("FTC"), and the United States of America and alleges as follows:

### NATURE OF THE SUIT

1.     The current political leaders of the Antitrust Division and the FTC have made no secret of their hostility towards mergers and acquisitions involving the private equity industry. With little regard for legal precedent and antitrust law's historic focus on consumer welfare, these leaders have blocked transactions and brought lawsuits based on their arbitrary "preference for organic growth over growth through acquisition."  In pursuit of this political agenda, they have attempted to deter mergers altogether, and especially transactions involving private equity, by

increasing the cost to obtain regulatory clearance for such transactions.  Now, on the eve of a leadership transition, the Antitrust Division has threatened a final act of agency overreach:  the imposition of draconian and grossly disproportionate penalties on KKR based on alleged pre-merger paperwork errors that were immaterial to antitrust clearance.  The FTC, which is charged with promulgating rules for such pre-merger notification filings, has for years admitted that its own rules are "confusing" and "subject to a range of interpretations."  The Antitrust Division now intends to weaponize the FTC's "confusing" guidance by asserting strict liability and seeking to impose massive fines.

2.     The Antitrust Division's threatened actions have no legitimate basis.  After a sweeping investigation that has spanned nearly three years—with which KKR fully cooperated—the purported filing "errors" the Antitrust Division has identified are trivial.  Not a single alleged "error" was material to or interfered with any merger review.  Nor did any of the transactions that were the subject of the alleged filing "errors" pose any substantive antitrust concerns.  Indeed, in the only two transactions that involved any competitive overlap at all, KKR's filings expressly flagged it.  For the vast majority of transactions, KKR was acquiring a company in an industry in which it held no other business, or selling a company to another investment firm (rather than to an industry participant).

3.     The sole purpose of the Antitrust Division's threatened actions is to make an example of KKR and thereby chill merger and acquisition activity by imposing strict liability for alleged non-compliance with a confusing and at times contradictory web of rules and

requirements.[1]  While attempting to chill merger and acquisition activity and target private equity firms may fit the political agenda of the Antitrust Division's outgoing leadership, it bears no relationship to the text or purpose of the applicable statute, the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), and its associated regulations.

4.    The regulatory framework underlying this dispute is the HSR Act's pre-merger notification requirements, which Congress enacted to enable the government's antitrust investigation of certain mergers and acquisitions before closing—and to avoid so-called "midnight mergers."[2]  For transactions of a certain size, and subject to certain exceptions, the HSR Act requires parties to submit to the antitrust agencies a limited amount of basic information—including data and information about the parties, and, in one part of the form, "a reasonable number of genuinely important documents," 43 Fed. Reg. 33,450, 33,526 (July 31, 1978)—and to observe a statutory waiting period before a merger is permitted to close.

5.    The statute does *not* require the submission of *all* relevant documents.  And, importantly, the HSR filing is *not* the government's primary tool to investigate mergers.  Rather, the HSR filing is merely intended to alert the government to the transaction, and to provide enough basic information to allow the government to conduct a preliminary investigation to determine whether a more comprehensive investigation is warranted.  If the government wants

---

[1]    The FTC has proposed sweeping changes to the Notification and Report Form for Certain Mergers and Acquisitions and the related Instructions to the Notification and Report Form for Certain Mergers and Acquisitions, set to take effect on February 10, 2025, unless blocked by Congress pursuant to the Congressional Review Act or by a court pursuant to a legal challenge. 89 Fed. Reg. 89216 (proposed Nov. 12, 2024).  The alleged errors or omissions at issue here, however, occurred in connection with the existing Form, which has remained largely the same since it was promulgated in 1978.

[2]    *See* H.R. REP. 94-1373, 11 (1976) (noting that the bill would "help prevent the consummation of so-called 'midnight' mergers, which are designed to deny the government any opportunity to secure preliminary injunctions").

more information about a transaction, it has broad discretion to launch that more comprehensive investigation through a "Request for Additional Information and Documentary Materials" (colloquially called a "Second Request").

6.    KKR complied with the HSR Act for each transaction the Antitrust Division has investigated.  And, tellingly—despite the fact it has now investigated numerous deals that closed years ago—the Antitrust Division has not rushed to unwind any of them.

7.    Pursuant to the HSR Act, the FTC has promulgated a set of rules that, among other things, requires filers to submit "all studies, surveys, analyses and reports which were prepared by or for officers or directors" and created "for the purpose of evaluating or analyzing [an] acquisition with respect to market shares, competition, competitors, markets, potential for sales growth or expansion into product or geographic markets."  By its express terms, this so-called "Item 4(c) requirement" requires the production only of a narrow category of documents that meet all three criteria:  (1) they constitute "studies, surveys, analyses and reports," (2) they were prepared "by or for officers and directors," *and* (3) they were created "for the purpose" of analyzing a transaction with respect to "market shares, competition, competitors, markets, and potential for . . . growth or expansion."  In addition, the FTC's guidance states that only documents in final form need be submitted—not drafts unless the drafts went to the filer's board.

8.    The FTC's regulations do *not* call for filers to submit proprietary valuation materials that have no bearing on antitrust matters.  They do *not* call for materials detailing transactions that are merely under consideration but have not yet been agreed upon.  They do *not* call for materials that are otherwise unrelated to the proposed transaction.  They do *not* call for the enormously burdensome collection and search of all electronic documents.  And they do *not* require the submission of all drafts of documents.  Finally, and critically, the statute itself does

*not* contemplate perfection. Rather, as noted, it requires only the submission of relevant documents "necessary and appropriate" for the Antitrust Division or the FTC to assess a transaction. And it even permits mergers to close, following a prescribed waiting period or periods, after filers have "*substantially complied*" with their statutory obligations.[3]

9.      The FTC, which has a specialized staff dedicated to administering the rules, has acknowledged that "[r]esponding to Item 4(c) **can be confusing for filers because the item's broad language is subject to a range of interpretations**." And yet, the FTC's own guidance has muddied the waters further, through "informal interpretations" that are arbitrary and contradictory. Indeed, the FTC's database of its interpretations is "not actively monitored for consistency, changes in the statute or regulations, or evolving [FTC] views," and "one can find letters that relate to regulations that have since been repealed or modified and letters referring to positions taken by the [FTC] that have subsequently been disavowed," leaving practitioners frequently in the dark about what even qualifies as the controlling FTC guidelines.[4] The FTC has acknowledged that advice "may have been superseded by the time it is read" and that there may be "[c]onflicts, or apparent conflicts . . . [that] may or may not have been fully rationalized."[5] Moreover, as the American Bar Association's Antitrust Section acknowledges in its Premerger Notification Practice

---

[3]  As noted above, if the government has an interest in a transaction, it can issue a Second Request. Second Requests are sweeping compulsory requests for documents, data, and narrative statements that often result in the merging firms providing terabytes of data, millions of documents, and hundreds of pages of written submissions to the government (as well as depositions and interviews). Once a Second Request is issued, the parties cannot close the transaction until they substantially comply with it and observe a second statutory waiting period (unless the government agrees otherwise). Second Requests are the primary investigative tool for merger review.

[4]  Gregory L. Kinzelman, *United States v. Malone*: Lessons for HSR Practitioners on Premerger Notification Office Informal Interpretations, 9 Antitrust Source 1, 8 (2010).

[5] American Bar Association, Section of Antitrust Law, *Premerger Notification Practice Manual*, (5th Ed.), Introduction at xiii (quoting 1990 letter from a former director of the FTC's Bureau of Competition).

Manual, "[r]easonable, experienced HSR practitioners can (and do) disagree among themselves and with the [FTC's Premerger Notification Office] about the 'correct' application of HSR regulations to a given transaction."[6]

10.    The Antitrust Division has threatened to seek unprecedented and unconstitutional penalties against KKR, totaling hundreds of millions of dollars, for purported transgressions of this nebulous and shifting regulatory framework, in the hopes of pressuring KKR to bow to its will.  The figure that the Antitrust Division has sought dwarfs the highest penalties ever imposed in the history of the HSR Act, including in instances in which filers failed to make any filing whatsoever and others where filers deliberately *falsified* HSR filings for the purpose of evading antitrust scrutiny—neither of which is the case for KKR.  And the Antitrust Division contends that the penalties continue to mount by the day, based on a reading of the statute that would permit it to impose the maximum penalty of more than $51,000 per day for HSR filing errors *in perpetuity*, long after a transaction has closed.  This reading is not just illogical and untethered to the language of the statute itself—it is also patently unconstitutional.  Moreover, the Antitrust Division's approach to seeking a fine in this case bears no relationship whatsoever to any alleged harm caused by KKR's alleged filing deficiencies.  With just days left in office, the Antitrust Division's political leadership has demanded that KKR acquiesce to its unreasonable demands or face an inflammatory complaint seeking outrageous penalties and remedies.  KKR thus brings this action seeking to put an end to the Antitrust Division's improper overreach in applying a vague statute to levy unconstitutional penalties.

11.    Plaintiff seeks declarations that:  (i) Plaintiff did not violate the HSR Act; (ii) the Antitrust Division's and the FTC's interpretations of the HSR Act are unconstitutionally vague;

---

[6] *Id.* at xiv.

and (iii) the fines the Antitrust Division seeks are excessive in violation of the Fifth and Eighth Amendments to the Constitution of the United States.

## THE PARTIES

12.     Plaintiff KKR & Co. GP LLC is a Delaware limited liability company with its principal place of business in New York, New York.

13.     Defendant Doha Mekki is the Acting Assistant Attorney General of the United States for the Antitrust Division of the Department of Justice.  She is sued in her official capacity.

14.     Defendant United States Department of Justice is an Executive Department of the United States with its principal offices in Washington, D.C.

15.     Defendant Federal Trade Commission is an administrative agency of the United States government, established by the Federal Trade Commission Act, 15 U.S.C. §§ 41–58.

16.     Defendant is the United States of America.

## JURISDICTION AND VENUE

17.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 (federal question), and 1346 (United States as defendant).

18.     This Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and the Administrative Procedure Act, 5 U.S.C. §§ 705-706.

19.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1).

20.     Defendants lack sovereign immunity in a declaratory judgment action challenging their threatened violation of federal law.  *See* 5 U.S.C. § 702; *Larson v. Domestic and Foreign Commerce Corp.*, 337 U.S. 682, 691 n.11 (1949); *Dugan v. Rank*, 372 U.S. 609, 621-22 (1963); *Trudeau v. Federal Trade Comm'n*, 456 F.3d 178 (D.C. Cir. 2006).

21.     Plaintiff has standing to bring the claims set out in this complaint. The threatened enforcement of a law constitutes an imminent Article III injury in fact. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-59 (2014). An "actual arrest, prosecution, or other enforcement action is not [an Article III] prerequisite" to suing—only "a credible threat of enforcement" need be alleged. *Id.* at 159; *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (plaintiff had standing where he "alleged threats of prosecution that c[ould not] be characterized as 'imaginary or speculative'"); *Louisiana Children's Med. Ctr. v. United States*, 2:23-cv-01305-LMA-MBN, Dkt. No. 1 at 16 (E.D. La. 2023) (seeking declaratory judgment that completed acquisition was immune from antitrust laws in the face of a threatened enforcement action).

22.     The requirements for standing are met here because the government alleges that Plaintiff has committed specific acts proscribed by statute and has explicitly threatened to imminently file an unconstitutional enforcement action against it. *See, e.g.*, *New Hampshire Lottery Comm'n v. Rosen*, 986 F.3d 38, 50 (1st Cir. 2021) (finding no uncertainty about whether a plaintiff would follow through on a stated intention to violate the law where plaintiff had already engaged in conduct branded as criminal by the Antitrust Division); *Nat'l Ass'n for Gun Rts., Inc. v. Garland*, 2024 WL 3517504, at *7 (N.D. Tex. July 23, 2024) (standing where plaintiff had already engaged in conduct arguably proscribed by statute and there was a credible threat of prosecution); *Manville Corp. v. United States*, 139 B.R. 97, 107-08 (S.D.N.Y. 1992) (standing where plaintiff had Hobson's choice of "opt[ing] to settle, assuming responsibility for a significant amount of clean-up costs and waiving what it considers to be a strong defense" or "exposing itself to almost limitless liability" in an enforcement action).

## BACKGROUND

1. **The Hart-Scott-Rodino Antitrust Improvements Act**

   A. **The HSR Act Is Passed To Ensure Filers Submit "A Reasonable Number Of Genuinely Important Documents" To Facilitate Pre-Merger Antitrust Review**

23.     In 1976, Congress enacted the HSR Act to provide the federal antitrust agencies time to review certain transactions before they are consummated to determine whether they violate Section 7 of the Clayton Act, which proscribes mergers that may substantially lessen competition or tend to create a monopoly.

24.     The HSR Act provides that, before consummating a qualifying transaction, the parties must file a Notification and Report Form for Certain Mergers and Acquisitions ("HSR filing") with the Antitrust Division and the FTC, and refrain from closing the transaction until the prescribed waiting period—typically 30 days—has elapsed.  The HSR filing is designed to give the government notice of a potential transaction and "a meaningful opportunity to seek a preliminary injunction" before an allegedly illegal merger is consummated.  S. Rep. No. 94-803, at 65 (1976).[7]

25.     The HSR Act gives the FTC, with the concurrence of the Assistant Attorney General for the Antitrust Division, the authority to promulgate rules to ensure that an HSR filing contains "such documentary material and information relevant to a proposed acquisition as is necessary and appropriate . . . to determine whether such acquisition may, if consummated, violate the antitrust laws."  15 U.S.C. § 18a(d)(1).

---

[7]   The government also can (and does) challenge transactions after they have closed.  Thus, the HSR process is not the government's only tool to address allegedly anticompetitive mergers and acquisitions.

26.     Among other requirements, Item 4 of the Notification and Report Form calls for a filing entity to provide documents created "for the purpose of evaluating or analyzing the acquisition with respect to market shares, competition, competitors, markets, potential for sales growth or expansion into product or geographic markets."  FTC, Item 4(c) Tip Sheet (Nov. 28, 2016), *available at* https://www.ftc.gov/system/files/attachments/hsr-resources/4ctipsheet.pdf.  The purpose of the Item 4 requirement is to provide the antitrust agencies a "reasonable number of genuinely important documents" to investigate whether a transaction may impact competition. 43 Fed. Reg. 33,450, 33,526 (July 31, 1978).

27.     If the initial waiting period is coming to an end and the agencies determine that additional information is needed to assess the competitive impact of a proposed transaction, then the agencies can issue a Second Request, triggering an extensive and lengthy investigation.  Parties can complete the transaction only when they have "substantially complied" with the initial filing requirement and any subsequent request, and the waiting period has expired, or when the government either closes its investigation or otherwise agrees that the transaction can proceed, subject to any agreed-upon remedies.[8]

## B.  The FTC Promulgates Vague Regulations And Inconsistent Guidance

28.     The FTC first promulgated rules under the HSR Act in 1978.  *See* 43 Fed. Reg. 33,450 (July 31, 1978).  Acknowledging the amorphous nature of those rules, the FTC empowered itself to issue formal and informal interpretations concerning whether a party has met the requirements of the Act.  *See* 16 C.F.R. § 803.30.  In the decades since the agency promulgated the rules, it has issued voluminous, and at times arbitrary and conflicting interpretations of the

---

[8]  *See* FTC, Premerger Notification and the Merger Review Process, https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/mergers/premerger-notification-merger-review-process.

Item 4 requirements.  As a result, the requirements of the HSR Act are often unclear, and even the FTC itself has admitted as much.  Seasoned practitioners who specialize in HSR filings—including the sophisticated law firms that advised KKR—are left to rely on a web of informal FTC opinions to navigate rules that are confusing, internally inconsistent, and riddled with exceptions.

29.     For example, the FTC's "informal position for many years" is that Item 4(c) requires the submission of only final versions of documents, unless a draft document was submitted to the company's board of directors (or equivalent); in that case, the FTC explains that the draft "ceases to be a draft," even if it remains in draft form and a true final version is also submitted with the HSR filing.  FTC, Item 4(c) Tip Sheet (Nov. 28, 2016).

30.     As another example, the FTC permits parties to redact board minutes to provide only the relevant Item 4 content, but it does not allow parties to redact irrelevant content from other documents.[9]  Why the distinction?  The FTC declines to say.[10]  Presumably the justification for allowing board minutes to be redacted is that board minutes contain highly confidential information unrelated to the agencies' antitrust review.[11]  But so do many other documents.

---

[9]   *Compare* HSR Informal Interpretation 2105006, https://www.ftc.gov/legal-library/browse/hsr-informal-interpretations/2105006, *with* HSR Informal Interpretation 802014, available at https://www.ftc.gov/legal-library/browse/hsr-informal-interpretations/0802014.

[10]   *See* HSR Informal Interpretation 1908006, https://www.ftc.gov/legal-library/browse/hsr-informal-interpretations/1908006.

[11]   *See* HSR Informal Interpretation 405011, https://www.ftc.gov/legal-library/browse/hsr-informal-interpretations/0405011.

31.    As a third example, the FTC does not require parties to produce text messages, instant messages, videos, or voice mails, even if they contain information responsive to Item 4.[12] But it has not explicitly made a similar exception for emails.  Why the distinction?  The FTC has provided no reason.

32.    Given the FTC's inconsistent stance on what Item 4 requires, it should come as no surprise that the agency itself has acknowledged that "[r]esponding to Item 4(c) can be confusing for filers because the item's broad language is subject to a range of interpretations."[13]  And yet here, Defendants take the position that even minor and inadvertent violations of these arcane and inconsistent requirements should subject filers to hundreds of millions of dollars in penalties.

### C. The Antitrust Division's Politically-Motivated Enforcement Action Is Inconsistent With The HSR Act And Applicable Precedent

33.    The HSR Act was adopted to provide the federal antitrust agencies with sufficient time before a reportable transaction is finalized to assess the likelihood that a proposed transaction would violate Section 7 of the Clayton Act, which prohibits mergers and acquisitions only where the "effect . . . may be substantially to lessen competition . . .or tend to create a monopoly . . . in any line of commerce . . .in any section of the country."  15 U.S.C. § 18.  Accordingly, filing parties are prohibited from closing notifiable transactions until the end of the statutory waiting period.  But Congress explicitly did *not* intend to ensnare parties that have "substantially complied"

---

[12]    *See* HSR Informal Interpretation 1906008, https://www.ftc.gov/legal-library/browse/hsr-informal-interpretations/1906008 (text messages); HSR Informal Interpretation 2007004, *available at* https://www.ftc.gov/legal-library/browse/hsr-informal-interpretations/2007004 (instant messages); HSR Informal Interpretation 1603004, https://www.ftc.gov/legal-library/browse/hsr-informal-interpretations/1603004 (videos); HSR Informal Interpretation 706019, https://www.ftc.gov/legal-library/browse/hsr-informal-interpretations/0706019m (voice mails).

[13]    FTC, Item 4(c) Tip Sheet (Nov. 28, 2016), https://www.ftc.gov/system/files/attachments/hsr-resources/4ctipsheet.pdf (emphasis added).

with the statute for immaterial omissions and other minor errors.  Nor did it intend to punish them with exorbitant penalties that accrue indefinitely where an HSR filing contains "such documentary material and information relevant to a proposed acquisition as is necessary and appropriate . . . to determine whether such acquisition may, if consummated, violate the antitrust laws."  *See* 15 U.S.C. § 18a(d)(1).  Both the statute itself, and its implementing regulations, provide exactly the opposite—consistent with the Clayton Act's underlying presumption that mergers and acquisitions are an important part of a dynamic economy.

34.    Nor has the HSR Act ever been applied so punitively over immaterial slips. Indeed, in the more than four decades that the statute has existed, the antitrust agencies have almost never sought to impose significant civil penalties.  And in the rare instances they did, the penalties were for serious and intentional and/or repeated noncompliance, not inconsequential or inadvertent errors.

35.    To date, the largest penalty imposed for a violation of the HSR Act was $11 million applied to VA Partners I, LLC, a repeat offender that had committed prior HSR Act violations for which it was sanctioned, and then failed to submit *any* HSR filing before closing a reportable transaction.  Similarly, in *United States v. Pyo* and *United States v. Nautilus Holdings, Inc.*—where the defendants materially altered Item 4 documents with the criminal intent to misrepresent the competitive impact of a proposed acquisition—the Antitrust Division concluded criminal plea agreements that penalized the defendants only $200,000 each.

36.    The Antitrust Division's threatened action against KKR is massively disproportionate to any previous HSR enforcement action.  It follows a series of public statements by the political leadership of the Antitrust Division and the FTC pursuing an ideological agenda that targets the private equity industry.

37.    In an interview with the Financial Times, for example, former Assistant Attorney General Jonathan Kanter, the then-head of the Antitrust Division, claimed the private equity "business model is often very much at odds with the law."[14]  Likewise, Andrew Forman, a Deputy Assistant Attorney General in the Antitrust Division, claimed that private equity had a focus on "short-term gains and aggressive cost-cutting" rather than innovation and quality, which "can lead to disastrous [] outcomes and, depending on the facts, may create competition concerns."[15] Brendan Ballou, the Antitrust Division's former "Special Counsel for Private Equity," authored a book in which he purported to describe "private equity's plan to pillage America."[16]  And Lina Khan, the Chair of the FTC, identified "private equity" as a business model that could "distort ordinary incentives in ways that strip productive capacity and may facilitate unfair methods of competition."[17]  Chair Khan has further stated that "[a]ntitrust enforcers must be attentive to how private equity firms' business models may in some instances distort incentives in ways that strip productive capacity, degrade the quality of goods and services, and hinder competition."[18]

---

[14]    *See* Stefania Palma, *Crackdown on buyout deals coming, warns top US antitrust enforcer*, Financial Times (May 19, 2022), https://www.ft.com/content/7f4cc882-1444-4ea3-8a31-c382364aace1.

[15]    Department of Justice, Press Release, Deputy Assistant Attorney General Andrew Forman Delivers Keynote at the ABA's Antitrust in Healthcare Conference (June 3, 2022), https://www.justice.gov/opa/speech/deputy-assistant-attorney-general-andrew-forman-delivers-keynote-abas-antitrust.

[16]    *See* Brendan Ballou, *Plunder:  Private Equity's Plan to Pillage America* (2023).

[17]    Chair Lina M. Khan, *Vision and Priorities for the FTC* (Sept. 22, 2021), https://www.ftc.gov/system/files/documents/public_statements/1596664/agency_priorities_memo_from_chair_lina_m_khan_9-22-21.pdf.

[18]    Statement of Lina M. Khan Joined by Commissioner Rebecca Kelly Slaughter and Commissioner Alvaro M. Bedoya in the Matter of JAB Consumer Fund/SAGE Veterinary Partners, Commission File No. 2110140 (June 13, 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/2022.06.13%20-%20Statement%20of%20Chair%20Lina%20M.%20Khan%20Regarding%20NVA-Sage%20-%20new.pdf.

38.     The outgoing political leadership of the Antitrust Division and the FTC has accelerated their attacks on businesses before leaving office.  As of October 1, 2024, nearly half of the S&P 500, by market capitalization, was under antitrust investigation.[19]  That number has continued to grow in the immediate aftermath of the recent Presidential election, in the waning days of the current Antitrust Division leadership.  *See*, *e.g.*, *United States v. UnitedHealth Grp. Inc.*, 1:24-cv-03267 (D. Md. Nov. 12, 2024); *FTC v. S. Glazer's Wine and Spirits, LLC*, 8:24-cv-02684 (C.D. Ca. Dec. 12, 2024).

39.     In short, KKR is not alone.  Indeed, the House Judiciary Committee recently launched an investigation into the Antitrust Division, in connection with Antitrust Division's aggressive enforcement posture in the wake of the presidential election, which has included "demand letters [issued] to numerous businesses indicating an intention to start enforcement actions in the final days" of the current administration.[20]

## 2.     Plaintiff Complied With The HSR Act

### A.  KKR's Background

40.     KKR was founded in 1976 by Jerome Kohlberg, Henry Kravis, and George Roberts.

41.     KKR is a preeminent global investment firm that offers alternative asset management as well as capital markets and insurance solutions.  KKR has been publicly traded on the New York Stock Exchange since 2010.

---

[19]  *See* Liz Hoffman, *Semafor Business*, Semafor, Oct. 1, 2024, https://www.semafor.com/newsletter/10/01/2024/ken-chenault-former-amex-ceo-is-in-contention-for-jobs-if-harris-wins.

[20]  Letter from Jim Jordan, Chairman, House Committee on the Judiciary, to Assistant Attorney General Jonathan Kanter (Nov. 14, 2024), https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/evo-media-document/2024-1114%20JDJ%20to%20Kanter%20re%20 doc%20preservation.pdf.

42.    With over $600 billion of assets under management, KKR is the one of the world's largest alternative asset management firms.  Its product offerings include private equity, private credit, infrastructure, real estate and other investments.  KKR aims to generate attractive investment returns by following a patient and disciplined investment approach, employing world-class people, and supporting growth in its portfolio companies and communities.  The investors in KKR's funds include large public and corporate pension funds, charitable institutions, university endowments, and insurers, among many other institutions and investors.

43.    KKR has completed more than 765 private equity investments in portfolio companies with a total transaction value in excess of $735 billion.  These investments include domestic and international companies from diverse industries, including health care, technology, energy, industrial, real estate, financial services, and consumer products and services.  Because KKR is a financial investor, the vast majority of its transactions do not raise any competitive concerns.

44.    KKR employs over 4,000 people.  It operates multiple offices across the United States, as well as offices around the world in Europe and Asia.  KKR's portfolio companies employ more than 830,000 people around the world.

45.    Integrity, and commitment to its clients, employees, and stakeholders, is the cornerstone of KKR's business.  The company takes its responsibilities to comply with the law very seriously, and KKR's clients recognize that KKR is committed to complying with all of its regulatory obligations.

### B. Filings In The Transactions At Issue Were Not Prepared With Intent To Violate The HSR Act

46.    The Antitrust Division's investigation into KKR's compliance with HSR filing requirements is unprecedented in scope.  Over the course of nearly three years, it has involved

exacting scrutiny of numerous transactions involving HSR filings made in 2021 and 2022. And yet, in the wake of that sweeping inquiry, all the Antitrust Division has to show are claims of paperwork filing mistakes, with no impact on substantive antitrust oversight. It is on this flimsiest of bases that it now seeks to impose staggering financial penalties. <u>First</u>, it contends that KKR's HSR filings for certain transactions were incomplete, insofar as they purportedly failed to include *all* documents that were potentially responsive to Item 4—notwithstanding the fact that the statute requires only the production of relevant documents "necessary and appropriate" to assess whether a transaction violates the antitrust laws. <u>Second</u>, the Antitrust Division asserts that in a handful of instances, KKR submitted edited versions of individual documents as part of its HSR filings—notwithstanding the fact that the FTC's *own* regulations do not require the submission of irrelevant information, and even contemplate its redaction in certain instances.

47.     Critically, the investigation has uncovered *no evidence* that any of the purported errors interfered with the government's antitrust review, or that there was any intent to do so—because neither of those things is true. The alleged errors were, on their face, immaterial, based on good-faith interpretations of what the FTC acknowledges are the HSR Act's "confusing" requirements. The bottom line is that KKR's HSR filings complied with the HSR Act and applicable regulations. The filings indisputably provided the Antitrust Division with notice that the transactions were pending, as well as information that was more than sufficient for the government to complete its antitrust review, or to issue Second Requests for additional information. Tellingly, however, the Antitrust Division did *not* issue Second Requests for the overwhelming majority of deals, despite being fully informed of the precise transactions and any

competitive overlap.[21]   For good reason:   the deals did not feature competitive overlaps, or otherwise substantially lessen competition or tend to create a monopoly.   Accordingly, KKR and its respective counterparties closed the transactions after the expiration of the statutory waiting period.

48.      Two examples, discussed below, exemplify the meritless nature of the Antitrust Division's claims.

### i. The Atlantic Transactions

49.      "Fixed Base Operators" ("FBOs") are entities that sell aviation fuel and provide flight support to planes using private airports.   There are over 3,000 FBO locations in the United States.

50.      Atlantic Aviation FBO Inc. is a company that had 69 FBO locations at airports in 30 states.   KKR investment funds acquired Atlantic Aviation in 2021 for $4.475 billion.

51.      After its acquisition by KKR investment funds, Atlantic Aviation acquired Lynx FBO Network ("Lynx"), which had 9 FBO locations.   There was no overlap at the airport-level between Atlantic's 69 locations and Lynx's 9 locations.

52.      Following the Lynx acquisition, Atlantic Aviation merged with Ross Aviation ("Ross") (together with the acquisition of Atlantic Aviation, and the acquisition of Lynx, the "Atlantic Transactions").   At the time of the acquisition, Ross had 16 FBO locations.   Prior to the close of the transaction, there was only a single airport where Ross and Atlantic Aviation both had FBO locations; in this single location, the proposed transaction would have resulted in Atlantic being the sole FBO owner at that location.   After consulting with the Antitrust Division and the

---

[21]   In only one deal, the Antitrust Division issued a long after-the-fact purported Second Request during the course of its investigation.

Florida Attorney General's office, Atlantic Aviation voluntarily agreed to divest one of these two FBO locations concurrently with the acquisition.  As a result of the voluntary divestiture, there was no airport-level overlap resulting from the transaction.

### ii.  KKR Had No Intent To Violate Antitrust Laws In Connection With The Atlantic Transactions

53.     The HSR filings submitted by KKR in connection with the Atlantic Transactions included documents necessary and appropriate to facilitate an initial pre-merger antitrust review and provided information sufficient for the Antitrust Division to determine whether to investigate further.  The filings contained information about Atlantic's FBO locations and the FBO locations of the subsequent acquisition targets.  They disclosed that Atlantic Aviation was contemplating both the Lynx and Ross acquisitions.   And the Antitrust Division—in possession of this information and armed with an unfettered ability to ask questions of the parties, research the marketplace, solicit views of third parties, issue subpoenas, and take investigatory depositions— allowed the statutory waiting periods on *both* the Lynx transaction *and* the Ross transaction to expire, and the acquisitions to close, without even issuing a Second Request.

54.     Now, however, some three years after the Lynx transaction closed and more than two years after the Ross transaction closed, the government alleges that the *pre-merger* HSR filings for those transactions were deficient and has threatened to seek, among other things, the *maximum* penalty in connection with the Lynx transaction.  The purported justifications?  First, that the filings allegedly did not include *all* responsive documents—even though the purportedly omitted documents contained information that was entirely *duplicated* in other materials included in the

HSR filing or that was not clearly required to be included in the HSR filing.[22]  And second, that the version of one document that *was* submitted in connection with the HSR filing for the Lynx transaction purportedly omitted pages with details about the *potential* subsequent acquisition of Ross—notwithstanding the fact that the Ross acquisition had not yet even been agreed upon, and was therefore not even eligible for merger clearance.  In all events, the very same document *did* include significant information about that potential Ross acquisition on multiple pages, including maps showing the potentially combined locations of Atlantic, Lynx and Ross (labeled as such), as well as a discussion of the "Lynx + Ross Investment Thesis."  In sum, the alleged omissions were insubstantial, irrelevant to an antitrust analysis of the Lynx transaction, and redundant with information included elsewhere in the filing, as well as in the subsequent HSR filing for the Ross transaction (once the parties agreed to proceed with that transaction).

55.    Moreover, the FTC's recent amendments to the HSR Notification and Report Form specifically request "[d]ocuments that were created in the ordinary course of business and not solely for the purpose of evaluating the transaction . . . [because such documents] may . . . discuss *other potential acquisition targets*."  89 Fed. Reg. at 89304.  The Notification and Report Form that is currently operative (and was operative at the time of the Lynx and Ross transactions)

---

[22]   The purportedly omitted documents were located only by using forensic discovery tools that one of the FTC's own commissioners has observed are not required in connection with HSR filings.  *See* Statement of Commissioner Melissa Holyoak, *Final Premerger Notification Form and the Hart-Scott-Rodino Rules Commission File No. P239300* (Oct. 10, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/holyoak-hsr-rule-statement.pdf  ("Forensic collections, that is a full collection of an individual's emails or documents, are incredibly burdensome.  They not only require resources from a technical team to collect the materials; they also require time from the individual businesspeople and then, in most cases, counsel, to review the collected materials, identify responsive documents, conduct privilege reviews, prepare more expansive privilege logs, and prepare the documents for production.  *The status quo for HSR filings, where generally only final versions are produced, typically does not require a forensic collection*.") (emphasis added).

does *not* require submission of such ordinary course documents. The fact that the FTC now seeks to amend the Notification and Report Form to request the very information that the Antitrust Division contends resulted in a non-compliant HSR filing demonstrates that the Antitrust Division's allegations have no merit.

### iii.  The Lightcast Transaction

56.     In 2019, KKR investment funds acquired Burning Glass Technologies ("Burning Glass"), a provider of labor-market analytics. Burning Glass used its database of job-market supply and demand information to offer analytics to corporations, government agencies, and institutions of higher education, among other customers. In April 2021, Burning Glass acquired and merged with Economic Modeling LLC ("Emsi"), another provider of labor-market analytics. The combined company was renamed Lightcast (the "Lightcast Transaction").

### iv.  KKR Had No Intent To Violate Antitrust Laws In Connection With The Lightcast Transaction

57.     The HSR filing submitted in connection with the Lightcast Transaction likewise included documents sufficient to facilitate the Antitrust Division's pre-merger antitrust review and for the Antitrust Division to determine whether to investigate further. Indeed, the filing included a document specifically acknowledging that Burning Glass and Emsi competed "head to head" and that Emsi was bigger and more profitable than Burning Glass. The Antitrust Division, however, permitted the waiting periods to expire and the transaction to close.

58.     Now, however, more than three years later, the government alleges that the HSR filing was deficient and threatens to seek maximum penalties for periods long after the merger closed. The purported reasons? One document submitted as part of the filing omitted stock language from a third-party consultant's public website, which had nothing to do with and was not part of any analysis for the Lightcast Transaction itself; and additional documents purportedly

should have been included with the filing.  Once again, however, these alleged errors were minor, unintentional, and irrelevant to the Antitrust Division's review, relating to information that was either not responsive to Item 4 or contained elsewhere in the HSR filing.

**3.     The Antitrust Division Improperly Threatens Legal Action In Order To Force An Excessive Settlement**

59.     The Antitrust Division's investigation of KKR began in 2022.  KKR has cooperated fully with the investigation over the nearly three years it has been pending, including by producing thousands of documents, facilitating interviews and depositions with multiple employees, and making numerous presentations to the Antitrust Division.

60.     The investigation has uncovered no alleged omissions that interfered with the Antitrust Division's merger review, and *no evidence* of a deliberate effort by *any* KKR employee to do so.  Even in those instances in which allegedly incomplete document collection processes purportedly resulted in the omission of documents responsive to Item 4 from HSR filings, the information in those documents was, in most instances, duplicative of information that *was* submitted as part of the filings.  Likewise, in isolated instances in which allegedly edited versions of documents responsive to Item 4 were submitted as part of an HSR filing, the alleged edits principally concerned proprietary information related to valuation, returns, and other non-Item 4 topics that were immaterial to the Antitrust Division's antitrust review.  In short, any alleged errors in KKR's filings were inconsequential and inadvertent—the result of a good-faith effort by KKR's employees, in the face of Item 4's confusing and contradictory requirements.

61.     Beginning in September 2022, KKR enhanced its HSR processes, including by requiring mandatory annual HSR training for relevant KKR employees.

62.     Notwithstanding those findings, the steps KKR has taken, and KKR's cooperation with the investigation, the outgoing political appointees in the Antitrust Division have threatened

KKR with an inflammatory and damaging lawsuit if it does not accede to the Antitrust Division's demand for an unprecedented fine and other penalties before the new leadership of the Antitrust Division takes office.

## FIRST CAUSE OF ACTION
### (Declaratory Judgment That KKR Did Not Violate The HSR Act)

63.     KKR incorporates by reference the allegations contained in the previous paragraphs as though set forth fully herein.

64.     The HSR filings submitted in connection with the Atlantic Transactions, the Lightcast Transaction, and other acquisitions reviewed in connection with KKR's cooperation with the Antitrust Division's investigation did not violate the HSR Act, 15 U.S.C. § 18a.

65.     The HSR Act requires only the inclusion of documents that are "necessary and appropriate . . . to determine whether such acquisition may, if consummated, violate the antitrust laws."  15 U.S.C. § 18a(d)(1).  KKR is therefore only obligated to provide Defendants a "reasonable number of genuinely important documents" to investigate whether the transaction may impact competition.  43 Fed. Reg. 33,450, 33,526 (July 31, 1978).

66.     Notwithstanding the requirements of the HSR Act, Defendants have threatened the imposition of exorbitant penalties under 15 U.S.C. § 18a.

67.     Defendants' threatened civil enforcement action against KKR improperly exceeds the scope of the HSR Act.  For example, Defendants may not impose liability for KKR's purported failure to include information duplicative of information contained in documents submitted pursuant to Items 4 (c) and (d) of the HSR form.  Nor may Defendants impose liability for any purported failure to include information irrelevant to determining whether an acquisition would violate antitrust laws, or for a failure to include drafts of documents.  *See* HSR Informal

Interpretation        1204010,        https://www.ftc.gov/legal-library/browse/hsr-informal-interpretations/1204010-0.

68.    Further, the basis for Defendants' threatened civil enforcement action against KKR is arbitrary and capricious.   An agency decision is arbitrary and capricious when it is "internally inconsistent."  *Nat. Res. Def. Council v. U.S. Nuclear Regul. Comm'n*, 879 F.3d 1202, 1214 (D.C. Cir. 2018).

69.    Defendants' interpretations of the HSR Act and its duly promulgated regulations are internally inconsistent.   For example, the FTC does not have consistent policies on what constitutes a draft, when redactions can be made, and what types of documents must be submitted.

70.    Accordingly, an actual and ongoing controversy exists between KKR and Defendants as to their respective legal rights and duties.

71.    This dispute is ripe.   On information and belief, Defendants intend imminently to file a civil enforcement action based on alleged violations of the HSR Act.   According to Defendants, penalties for the alleged violations are currently accruing daily because of the allegedly defective HSR filings made years ago.   KKR disputes the factual and legal basis for such actions and penalties.

72.    KKR is thus entitled to declaratory relief.

## SECOND CAUSE OF ACTION
### (Declaratory Judgment That The Antitrust Division's And The FTC's Interpretations Of The HSR Act Are Unconstitutionally Vague)

73.    KKR incorporates by reference the allegations contained in the previous paragraphs as though set forth fully herein.

74.    KKR faces a threat of an imminent civil enforcement action under Section 18a.

75.    The Antitrust Division's and the FTC's current interpretations of Item 4 filing requirements are internally inconsistent and unconstitutionally vague.

76.    As one example, the FTC permits minutes of board meetings to be redacted to exclude non-Item 4 content, while other documents containing both Item 4 and non-Item 4 content must be produced in full (except for privileged communications).  *See, e.g.*, HSR Informal Interpretations 2105006, 1908006, 802014, 40511, 1709011, 305009.  This difference in treatment lacks any rational basis or clear statutory foundation.

77.    In a second example, the FTC has stated that otherwise-responsive documents with Item 4 material prepared by or for directors, board members, or investment committee members acting in their capacities as deal-team members—rather than as officers with the purpose of analyzing whether to consummate a transaction—may be omitted from HSR filings—a distinction the FTC concedes is a "very difficult line to establish."  *See* HSR Informal Interpretations 1207010, 1012001, 804009, 503019.

78.    In a third example, the FTC considers discussions of prospective "synergies" from a merger to be responsive to Item 4 in *some* instances—such as when the discussion is sufficiently "substantive," *see* HSR Informal Interpretation 1301011, or when it attaches a dollar amount to the prospective synergies and the underlying documents from which the dollar amount is drawn are missing, *see* HSR Informal Interpretation 1109010—but it does not require the filing of documents discussing prospective synergies without a dollar amount, or where the underlying document from which the dollar amount is drawn is filed.  *See* HSR Informal Interpretation 1109010.

79.    In a fourth example, the FTC has stated that valuations of companies are sometimes unresponsive and therefore need not be filed, *see* HSR Informal Interpretations 1206002, 1112008, while in other circumstances they are responsive and must be filed, *see* HSR Informal Interpretation 1508004.

80.     Indeed, the FTC's Item 4(c) Tip Sheet acknowledges that "[r]esponding to Item 4(c) can be confusing for filers because the item's broad language is subject to a range of interpretations."     *See*     Item     4(c)     Tip     Sheet     (Nov.     28,     2016), https://www.ftc.gov/system/files/attachments/hsr-resources/4ctipsheet.pdf.

81.     The agencies' vague interpretations of Item 4's requirements fail to provide clear guidance on which documents must be submitted, and create uncertainty about the scope of responsive documents, all while exposing filers to potentially limitless statutory penalties of up to $51,774 per day from the time a transaction closes until a corrective filing is made, and any waiting period expires.  *See* 15 U.S.C. § 18a(g)(1); 28 U.S.C. § 2461 note; 89 Fed. Reg. 1445 (2024).

82.     The FTC's interpretations of the HSR regulations are "internally inconsistent" and therefore arbitrary and capricious.  *Nat. Res. Def. Council v. U.S. Nuclear Regul. Comm'n*, 879 F.3d 1202, 1214 (D.C. Cir. 2018).

83.     The agencies' interpretations of HSR filing requirements are unconstitutionally vague.

## THIRD CAUSE OF ACTION
**(Declaratory Judgment That The Antitrust Division Seeks An Excessive Fine In Violation Of The Fifth And Eighth Amendments To The U.S. Constitution)**

84.     KKR incorporates by reference the allegations contained in the previous paragraphs as though set forth fully herein.

85.     The primary purpose of the statutory scheme is to provide antitrust enforcement agencies with the opportunity to identify and review potentially anticompetitive mergers and acquisitions.

86.     The requirement to submit Item 4 documents provides only that filers must submit "a reasonable number of genuinely important documents."  43 Fed. Reg. 33,525, 33,526 (July 31, 1978).

87.     KKR entities filed HSR notifications for qualifying transactions pursuant to rules promulgated by the FTC and observed the applicable waiting periods.

88.     The HSR Act, 15 U.S.C. § 18a(g)(l), provides that a failure to comply with the statute shall result in liability for a "civil penalty of *not more than*" $51,744 per day.

89.     Because the HSR filings submitted by KKR entities complied with regulatory requirements by providing relevant documents that were "necessary and appropriate" to determine whether the proposed transactions violated the antitrust laws," 15 U.S.C. § 18a(d)(1), KKR did not violate the HSR Act—much less in such a way as to justify the exorbitant civil penalties the Antitrust Division seeks.

90.     The Eighth Amendment to the United States Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. Amend. VIII.

91.     The Excessive Fines Clause forbids the federal government from imposing a fine that "is grossly disproportional to the gravity of the defendant's offense."  *United States v. Bajakajian*, 524 U.S. 321, 334 (1998).

92.     The Due Process Clauses of the Fifth and Fourteenth Amendments impose "substantive limits" on the government's discretion to impose punitive damages, *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003), which "operate as 'private fines' intended to punish the defendant and deter future wrongdoing," *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 432 (2001).

93.     The largest penalty ever imposed for a violation of the HSR Act to date was $11 million for a complete failure to file an HSR notification for a reportable transaction.

94.     The Antitrust Division has issued Civil Investigative Demands ("CIDs") seeking information on numerous KKR transactions for which an HSR notification was filed. The Antitrust Division has previously taken the position that a party that files an incomplete HSR notification or fails to file one at all is in violation of the HSR Act every day from when the transaction closes until a corrective filing is made, and any waiting period expires. *See* Complaint at 6–7, *U.S. v. Cohen*, No. 1:24-cv-02670 (D.D.C. Sept. 18, 2024).

95.     Based on this reading, the Antitrust Division has alleged that KKR is facing hundreds of millions of dollars in civil penalties, which it alleges continue to accrue by the day.

96.     Such penalties are "grossly disproportional to the gravity" of any offense the Antitrust Division alleges. *Bajakajian*, 524 U.S. at 334. KKR's alleged HSR filing errors did not hinder the government's review of any transactions for antitrust concerns. The information KKR provided in the HSR filings was more than sufficient for the government to conduct its antitrust review of the transactions. Moreover, as soon as KKR became aware of the alleged errors, it cooperated fully with the government's investigation, voluntarily reported the results of its internal review to the Antitrust Division, and undertook extensive remedial measures to train its employees and enhance its HSR filing procedures.

97.     Such penalties also violate the substantive limits imposed by the Due Process Clauses on the government's ability to impose monetary penalties.

## PRAYER FOR RELIEF

For the reasons above, KKR respectfully requests the following relief:

- a declaration, order, and judgment holding that KKR has not violated the HSR Act, 18 U.S.C. § 18a;

- a declaration, order, and judgment holding that the Antitrust Division's and FTC's interpretations of the HSR Act are unconstitutionally vague;

- a declaration, order, and judgment holding that the fines the Antitrust Division seeks are excessive in violation of the Fifth and Eighth Amendments to the U.S. Constitution; and

- any other relief this Court deems just and proper.

DATED:  January 14, 2025                    Respectfully submitted,

                                            By _____
                                                    */s/ William A. Burck*

                                            William A. Burck (D.C. Bar. No. 979677)
                                            Michael D. Bonanno (D.C. Bar. No. 998208)
                                            **QUINN EMANUEL URQUHART &
                                            SULLIVAN, LLP**
                                            1300 I Street, N.W., Suite 900
                                            Washington, DC 20005
                                            Tel: 202.538.8000
                                            Fax: 202.538.8100
                                            williamburck@quinnemanuel.com
                                            mikebonanno@quinnemanuel.com


                                            Andrew J. Rossman (*pro hac vice forthcoming*)
                                            Stephen E. Frank (*pro hac vice forthcoming*)
                                            Mario O. Gazzola (*pro hac vice forthcoming*)
                                            **QUINN EMANUEL URQUHART &
                                            SULLIVAN, LLP**
                                            295 Fifth Avenue
                                            New York, NY 10016
                                            Tel: 212.849.7000
                                            Fax: 212.849.7100
                                            andrewrossman@quinnemanuel.com
                                            stephenfrank@quinnemanuel.com
                                            mariogazzola@quinnemanuel.com


                                            John Bash (D.C. Bar. No. 988874)
                                            **QUINN EMANUEL URQUHART &
                                            SULLIVAN, LLP**
                                            300 West 6th St., Suite 2010
                                            Austin, TX 78701
                                            Tel: 737.667.6100
                                            Fax: 737.667.6110
                                            johnbash@quinnemanuel.com

Charles F. Rule (D.C. Bar. No. 370818)
Deborah Garza (D.C. Bar. No. 359259) (*pro hac vice forthcoming*)
Daniel J. Howley (D.C. Bar. No. 983664)
**RULE GARZA HOWLEY LLP**
901 Seventh Street, NW
Suite 600
Washington, D.C. 20001
Tel: 202.843.9280
Fax: 202.843.5661
rule@rulegarza.com
garza@rulegarza.com
howley@rulegarza.com

*Counsel for Plaintiff KKR & Co. GP LLC*

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to the Federal Rules of Civil Procedure, I hereby certify that, on January 14, 2025, all counsel of record who have appeared in this case are being served with a copy of the foregoing by email.

Dated:  January 14, 2025                    */s/ William A. Burck*
                                            William A. Burck